RONALD ADY, PLLC (USB 3694)
8 E. Broadway, Ste. 725
Salt Lake City, UT 84111
(801) 530-3122
(801) 746-3501 fax

Attorney for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| RAY BIRMINGHAM,<br><br>   Plaintiff,<br><br>   v.<br><br>EQUIFAX INC.; TRANSUNION LLC;<br>EXPERIAN  INFORMATION SOLUTIONS,<br>INC.; VERIZON COMMUNICATIONS,<br>INC. and VODAFONE GROUP, PLC, a joint<br>venture dba VERIZON WIRELESS;<br>CELLULAR INC. NETWORK<br>CORPORATION, UTAH RSA 6 LIMITED<br>PARTNERSHIP, VERIZON POWER<br>PARTNERS INC. AND WASATCH UTAH<br>RSA NO. 2 LIMITED PARTNERSHIP dba<br>VERIZON WIRELESS; VERIZON<br>WIRELESS UTAH, LLC operating under the<br>name and style of VERIZON WIRELESS;<br>VERIZON WIRELESS (VAW) LLC,<br>operating under the name and style of<br>VERIZON WIRELESS,<br><br>   Defendants. | **DECLARATION  OF RAY BIRMINGHAM**<br><br><br><br>**Case No.** 2:06-cv-00702 BSJ<br><br>**Judge** Bruce S. Jenkins<br><br>**Magistrate Judge** |

RAY BIRMINGHAM, deposes and declares as follows:

1.     I am over the age of 18 and mentally competent. I have personal knowledge of the

facts in this matter deposed to below and if called upon to testify, could and would do so.

2.      While residing in Reno, Nevada in 2003 I refinanced my mortgage through a

mortgage broker in Henderson, Nevada, which is adjacent to Las Vegas. I believe the information

I provided the mortgage broker was used to steal my identity. Attached as exhibit A is a police

report I filed with the Reno, Nevada police department regarding that identity theft. Attached as

exhibit B is a police report I filed with the Las Vegas, Nevada police department regarding that

identity theft. Attached as exhibit C is correspondence I received from Capital One regarding the

identify theft.

3.      I also reported the identity to Verizon Wireless and initially it was very responsive

to my identity theft problem. Attached as exhibit D is the telephone bill from Verizon Wireless in

which it acknowledges that its fraud department had investigated my identity theft report. I also

reported the identity theft to all three of the credit reporting agencies and had them put fraud

alerts on my credit history.  Despite having acknowledged that the disputed charges on my phone

bill were the result of identity theft, Verizon Wireless then proceeded to charge my Verizon

Wireless accounts for those fraudulent charges and became very aggressive in trying to collect

those fraudulent charges from me.

4.      One of the things that demonstrates just how aggressive (or careless) Verizon

Wireless was is that despite the fact that although I first complained about the fraudulent phone

accounts to Verizon Wireless in late November of 2003, it took repeated telephone calls by me to

get Verizon Wireless to finally disconnect those phones in January of 2004.  In looking back, it

seems Verizon Wireless could have cared less whether fraudulent charges continued to be

assessed against my account.

5.      When I became frustrated with Verizon Wireless's deceptive tactics and advised

Verizon Wireless in writing that I was terminating my telephone accounts, and sent the termination fees in for both accounts with that written termination notice, Verizon Wireless refused to terminate my accounts. This occurred despite the fact that my nephew's phone (which I paid for and was on my account) had not been used for four months prior to my April 21, 2004 letter terminating both accounts, and despite the fact that I stopped using my Verizon Wireless mobile phone as soon as I had written the termination letter.

6.      Instead, Verizon Wireless held one account open (#265562515) until March 2005, or an additional 12 months after termination, and continued to run up charges on that account, and held the other account (#669962438)open until September 2004, or five months after termination, and continued to run up charges on that account. It then sent the bogus "overdue" balances on these accounts to collection and started reporting one account on my credit in the fall of 2004. I then repeatedly disputed the Verizon Wireless charges to the three credit reporting agencies, but all of them refused to remove the Verizon Wireless derogatory accounts from my credit. It was not until I filed this lawsuit that the credit reporting agencies relented and finally removed the Verizon Wireless charges from my credit report.

7.      One of the things that I find frustrating is that Experian continues to deny that I disputed the Verizon Wireless charges with it. Because the derogatory trade line was being reported by all three credit reporting agencies, when I disputed the Verizon Wireless charges I disputed it with all three credit reporting agencies.  I disputed the Verizon Wireless charges in writing on January 21, 2005 and again on July 20, 2005. On both occasions I disputed the Verizon Wireless charges with Experian.  I also disputed the Verizon Wireless charges with all three credit reporting agencies by telephone, but I do not have record of those disputes.

3

8.     Verizon Wireless's and the credit reporting agencies continued reporting of the derogatory trade lines on my credit when I had repeatedly informed the credit reporting agencies that the Verizon Wireless charges were not mine, when I had specifically offered to provide them with any documents and information necessary to prove that they were not mine, and when they ignored this offer of proof; caused me to pay much more for interest rate charges on credit costs I incurred and to forfeit opportunities to invest in real estate.

9.     I am 60 years of age and divorced, my only child has long been an adult, my skills as an intensive care nurse for neurological patients are in demand, and so I have the ability to relocate to different cities. I have substantial experience in buying and selling homes used as my personal residence. So far as purchasing a personal residence goes, my practice when I am buying a home to live in is to purchase the best value I can identify and which I can afford, with the greatest potential for appreciation in price.

10.    In keeping with that philosophy, over the last decade I have typically purchased a residence with a view to re-selling it for a profit within a year or two after purchase. Listed below are the residences I have bought and sold from 1997 to date:

| 2217 West Village Dr., Dearborn, Michigan | Purchased 1997 for $116K | Sold 1999 for $149K | $33K |
| --- | --- | --- | --- |
| 9811 Suncrest Dr., Reno, NV | Purchased 1999 for $170K | Sold 2001 for $172K | -$5K[1] |
| 9142 Jefferson, Salt Lake City | Purchased 2001 for $88K | present residence | na |

---

[1] *See* Exhibit E. I had decided to relocate to Salt Lake and so moved back to Salt Lake and bought the Jefferson home, which I still live in.

4

| 541 Smithridge Park, Reno, NV | Purchased 2003 for $118K | Sold 2004 for $147K | $38K[2] |
| 6983 South Ufizzi Court, Salt Lake City | Purchased 2004 for $116K | Sold 2006 for $140K | $24K[3] |

11.     I continue to follow this pattern. In August of 2008 I purchased a very nice home in a new subdivision in Arizona with four bedrooms, two and one half baths, and a two car garage. The appraised value of that home has already increased by $20,000.00 since my purchase of it. I am presently negotiating an employment contract with a hospital in that area and I plan to relocate to the Arizona home if that contract is finalized.

12.     Through lengthy experience I have learned that a critical factor in obtaining financing for a real estate purchase at good interest rate is my credit score. Attached as Exhibit H is a true copy of my credit report and credit score from CBC Innovis dated October 23, 2003 (just prior to the Verizon Wireless charges being reported on credit) which shows that my credit score from the big three credit reporting agencies was between 773 and 778 (i.e., Equifax's Beacon score 773, Trans Union's Empirica score was 774 and Experian's Fair Isaac score was 788). Attached as Exhibit I is a true copy of my credit score from CBC Innovis dated March 29, 2005 (shortly after the Verizon Wireless charges were reported on my credit) which shows that my credit score from the same three credit reporting agencies was between 662 and 685 (i.e., Equifax's Beacon score was 665, Trans Union's Empirca score was 685 and Experian's Fair Isaac score was 662).  The 108 point drop in my average credit score had a substantial negative

---

[2] *See* Exhibit F. I invested substantial sums in this home, including a new central air and heating system, toilets and plumbing, blinds, etc. Because of this the basis for this home went from $118K to $133K.

[3] *See* Exhibit G.

5

effect on the interest rates that I paid for credit.

13.     Over the course of my life I have placed at least ten mortgages on real property and I have financed the purchase of at least five automobiles. As well, currently I have seven credit cards and I have had a number of other credit cards previously.  This experience has provided me with a good understanding of how my credit score affects the interest rate I incur in a credit transaction. In particular, I have known for a number of decades that a high credit score will result in my receiving the best interest rate available for a credit transaction that I enter into and that a mediocre credit score will result in my paying a substantially higher interest rate on the same type of credit transaction.

14.     In addition to the practical understanding I have acquired of how credit scores affect interest rates and the factors that cause a credit score to increase or decline, I have also been specifically educated about this subject from the information I have been provided to me  by discover card through its profile protect monitoring ( a service which I have subscribed to for a number of year), from cnnmoney.com (which also provided me with specific information on how fico scores work), and from other media sources I sought out to educate myself on this subject.

15.     For example, I know that one of the negative factors that most affects my credit score is having a 30, 60 or 90 day payment delinquency on my credit. As well,  having a debt written off as a bad debt and carrying a balance of more than 10% on my credit cards will also negatively affect my credit score.  Positive factors include having a credit card for a long period of time and timely paying that card, paying loans on time, and not having too many credit inquiries in a short period of time.

16.     Attached as exhibit J are my credit reports from Trans Union dated February 1,

6

2005 and August 8, 2005, as exhibit K my credit reports from Equifax dated August 6, 2005 and

May 3, 2006,  and as exhibit L my credit report from Experian dated May 3, 2006. On each of

these credit reports my only derogatory trade line is from Verizon Wireless. During the period

from October of 2003 through March 29, 2005, my income and employment had remained steady

and I did not incur any additional debt on my credit history.

17.     Based on the understanding of credit scores I have acquired over the years, the

only factor that can account for this 100 plus point decline in my credit score from October 23,

2003 to March 29, 2005 are the derogatory trade lines from Verizon Wireless reported on my

credit report during this time.  Verizon Wireless's negative credit reporting as the cause of this

drop is also confirmed by the fact that after I filed this lawsuit the three credit reporting agencies

finally removed the derogatory Verizon trade line from my credit.  When that happened my credit

score made a dramatic recovery. Attached as exhibit M is letter from Experian dated November

30, 2007 advising that my credit score was 772.  The removal of the derogatory Verizon Wireless

trade lines from my credit history is the only significant changes in my credit profile during this

time period.

18.     I also know that the credit scores stated in the October 23, 2003 report from CBC

Innovis are all high credit scores, meaning that in a credit transaction for a home mortgage, car

loan or credit card I would receive the best interest rate offered to someone with my income and

debt obligations. However, the credit scores stated in the March 29, 2005 report from CBC

Innovis are only mediocre credit scores (i.e., not good, not bad), meaning that the interest rate I

would incur in a credit transaction would be substantially more than if I had a high credit score.

19.     Commencing early in 2005 I had began to shop for a mortgage with which to

7

refinance my Jefferson Place residence. In the course of shopping for refinancing for my Jefferson Place residence I studied the interest rates then available for refinancing my mortgage. I obtained a good faith estimate of 7.65% from Ameriquest Mortgage, which was more than 2% higher than the 5.6% rate then generally available from prime lenders for borrowers with good credit (i.e., persons with scores in the range of my credit score in October 2003). Because this interest rate was so high I decided not to refinance through Ameriquest.

20.     I also tried to get re-financing through Bank of America at the preferred rate of 5.6%, but it denied me credit at that interest rate. Based on my experience I know that this denial was because my credit score was too low. Ultimately, I refinanced through a sub-prime lender, New Century Mortgage, at 6.4%. If my credit score had not been impaired by the derogatory trade line from Verizon Wireless, I could have qualified with a prime lender for an interest rate of 5.6%. New Century had originally told me that they would give me a 5.8% interest rate on the refinancing, but after they pulled my credit I was only able to get refinancing at 6.4%.

21.     The fact that I was having to pay more for credit caused me to become more cautious in my real estate transactions. In 2004 I identified a possible real estate purchase at a development  in West Jordan, Utah called the Seasons at Maples, that I believed had the potential to appreciate in value.  After visiting that development and viewing properties in that development, by 2005 I had narrowed my choice to two particular floor plans, which were very similar to each other, the Spring and the Summer floor plans in that development. Attached as Exhibit N is a true copy of the sales materials I retained from the Maples Project for the town home floor plan I had identified for purchase.

22.     Because of my adverse experience with interest rates in refinancing my home at 9142 Jefferson Place in Salt Lake City I decided not to acquire one of the town homes at the Maples development. If at this time by credit had been unimpaired, I would have purchased one of the town homes with a Spring or Summer floor plan and sold my residence at 9142 Jefferson Place.  In 2005 town homes like mine in the development in which my Jefferson Place town home is situated sold for between $130K and $140K. When I refinanced my mortgage with New Century Mortgage in April of 2005 they appraised my Jefferson Place town home. I have requested a copy of that appraisal and will supply it to the Court as soon as I am in receipt of it.

23.     As the schedule in paragraph 10 above shows, in the last decade I have typically re-sold a home within a year or two after purchase and so in December of 2007 I got onto the Bank of America's Website and checked on the price of town homes in the Maples development. I discovered that town homes with the same floor plan that I had almost purchased there in 2005 were selling for between some $249,000.00 and $273,000.00.  Attached as Exhibit O is a true copy of the Bank of America evaluation of home prices in that subdivision for the same type of floor plan I almost purchased. Also included in that Exhibit are the financing documents obtained from the Salt Lake County Recorder's office for each of those properties.

24.     Scheduled out below are the properties at the Maples subdivision  detailed in Exhibit O, which had the same floor plan as the units I was about to purchase (i.e., the units with the smaller floor plan).  The first column lists the address of each property, the second column is the last date that Bank of America performed a valuation on that property, the third column is the amount of that valuation, the fourth column lists the mortgages taken out by the original and subsequent purchasers on that property, the fifth column is the date of that mortgage and the sixth

column is the amount of that mortgage.

| Maples Address | Valu Date | Valu Amt. | Financing History | TrD Date | Tr D Amt. |
|---|---|---|---|---|---|
| 6842 Callery Ln. | 02/27/07 | $251, 288 | Hoang TrD | 02/25/08 | $161,892.00 |
| 6846 Callery Ln. | 02/27/07 | $271,589 | Black TrD | 06/06/07 | $224,000.00 |
| | | | Lory TrD | 01/16/08 | $172,800.00 |
| 6854 Callery Ln. | 02/27/07 | $269,082 | Ferrufino TrD | 03/25/05 | $130,100.00 |
| | | | Ferrufino TrD (2nd) | 03/25/05 | $32,500.00 |
| 6858 Callery Ln. | 02/27/07 | $252, 252 | Essen TrD | 10/27/06 | $150,320.00 |
| | | | Essen TrD (2nd) | 10/27/06 | $37,580.00 |
| 6844 Tupelo Ln. | 02/27/07 | $266,310 | Stringam TrD | 10/05/04 | $140,418.00 |
| 6856 Tupelo Ln. | 02/27/07 | $252,096 | Lory TrD | 11/29/04 | $118,898.00 |
| | | | Lory TrD (2nd) | 11/29/04 | $22,294.00 |
| 7712 New Snowbell Ln. | 01/05/07 | $255,024.00 | Eatchel TrD | 07/27/05 | $140,250.00 |
| | | | Eatchel Tr D (2nd) | 07/27/05 | $24,750.00 |
| 7724 New Snowbell Ln. | 01/05/07 | $255,024.00 | Lindhardt TrD | 04/04/06 | $158,840.00 |
| | | | Lindhardt TrD (2nd) | 04/04/06 | $39,600.00 |
| | | | Kassos TrD | 03/15/07 | $155,250.00 |
| | | | Kassos TrD (2nd) | 03/15/07 | $51,750.00 |
| 7729 New Snowbell Ln. | 01/05/07 | $249,975 | Lynch TrD | 06/24/05 | $131,097.00 |
| 7732 New Snowbell Ln. | 01/05/07 | $272,902 | Riches TrD | 05/18/05 | $124,232.80 |
| | | | Riches TrD (2nd) | 05/18/05 | $31,058.20 |
| | | | Riches TrD (refi) | 09/26/06 | $203,332.00 |
| | | | Kelly TrD | 05/28/08 | $209,413.00 |
| 7736 New Snowbell Ln. | 01/05/07 | $272,902 | Malamut TrD | 05/16/05 | $144,000.00 |
| | | | Wahlberg TrD | 07/18/07 | $173,500.00 |
| 7744 New Snowbell Ln. | 01/05/07 | $258,190 | Phillips TrD | 06/24/05 | $137,820.00 |

25.     Below is another schedule derived from the immediately preceding schedule.  In the schedule below the mortgage amounts are sorted by date in the first column, the second column is the amount of the mortgage, the third column combines first and second mortgages executed on the same date by the same purchaser and the fourth column is the average amount of the mortgages in each year.

| TrD Date | TrD Amt. | TrD Cons.[4] | Yearly Average[5] |
|---|---|---|---|
| 10/05/04 | $140,418.00 | $140,418.00 | |
| 11/29/04 | $22,294.00 | | |
| 11/29/04 | $118,898.00 | $141,192.00 | **$140,805.00** |
| 03/25/05 | $32,500.00 | | |
| 03/25/05 | $130,100.00 | $162,600.00 | |
| 05/16/05 | $144,000.00 | $144,000.00 | |
| 05/18/05 | $124,232.80 | | |
| 05/18/05 | $31,058.20 | $155,291.00 | |
| 06/24/05 | $137,820.00 | $137,820.00 | |
| 06/24/05 | $131,097.00 | $131,097.00 | |
| 07/27/05 | $24,750.00 | | |
| 07/27/05 | $140,250.00 | $165,000.00 | **$149,301.33** |
| 04/04/06 | $39,600.00 | | |
| 04/04/06 | $158,840.00 | $198,440.00 | |
| 09/26/06 | $203,332.00 | $203,332.00 | |

---

[4] In this column the amount of any first and second mortgage entered into on the same date by the same purchaser is combined.

[5] In this column the average mortgage balance underwritten in each year is stated.

| 10/27/06 | $37,580.00 | | |
|---|---|---|---|
| 10/27/06 | $150,320.00 | $187,900.00 | **$196,557.33** |
| 03/15/07 | $51,750.00 | | |
| 03/15/07 | $155,250.00 | $207,000.00 | |
| 06/06/07 | $224,000.00 | $224,000.00 | |
| 07/18/07 | $173,500.00 | $173,500.00 | **$201,500.00** |
| 01/16/08 | $172,800.00 | $172,800.00 | |
| 02/25/08 | $161,892.00 | $161,892.00 | |
| 05/28/08 | $209,413.00 | $209,413.00 | **$181,368.33** |

26.     The above schedules confirm that if I would have purchased a home at the Maples as I had originally planned, then based on the mortgage values scheduled above I would have grossed some  $47,000.00 on the sale of that home in 2006 and some $52,000.00 if I had sold the home in 2007. If the Bank of America valuations are instead used the amount I would have grossed some $100,000.00 to $120,000.00 on its sale.

27.     As well, I would have grossed some $42,000.00 to $52,000.00 on the sale of my Jefferson Place town home.  If it had not been for the difficulties I encountered as a result of Verizon Wireless's false reporting on my credit, I would have purchased a home at the Maples in 2005.

28.     The higher cost of credit I incurred due to the Verizon Wireless's derogatory trade lines on my credit was also reflected in the higher cost mortgage loan offered to me by Countrywide Home Loans (this was a home equity line of credit), in the denial of Chrysler credit of my application for zero percent financing on my purchase of a new Dodge truck, and in the higher cost of credit I incurred for credit cards. Attached as Exhibit P are my answers to

interrogatories detailing these credit problems.

29.     I suffered considerable emotional distress over a lengthy period of time and experienced intense embarrassment and humiliation because of the drop in my credit score.  For example, I was told by Ken Garff Auto Sales I did not qualify for zero percent financing on the purchase of a new Chrysler automobile and felt very annoyed and embarrassed by their demeanor when they told me I did not qualify. There were three or four people present when I was informed about this decision. The tone of voice that the Ken Garff sales representative used when he informed me that I did not qualify made feel like a deadbeat.

30.     I had never before experienced that kind of reaction when applying for credit and previously I had not felt that kind of condescending attitude from sales people.  This experience greatly reinforced the sense I already had that because of my mediocre credit score my standing in society had been reduced.

31.     My ongoing disputes with Verizon Wireless, my credit reporting disputes, and the resulting impairment in my ability to get credit likewise caused me a great deal of emotional distress. This distressed manifested itself in the form of allergies, gastro-intestinal reflux disorder (i.e., heartburn) and depression. I again refer the Court to Exhibit P, which contains my answers to interrogatories describing that stress, and attached as Exhibit Q are the prescriptions I received from my doctor for the symptoms I have just described.

32.     As well, I refer the court to my deposition transcripts where I also describe the symptoms of that stress and the treatment I received for it. For example in my deposition of February 14, 2008, attached as Exhibit R, I review the physical symptoms of emotional distress I incurred as a result of the Verizon Wireless credit problems at pages 65:10 to 66:15 (allergies,

stomach problems and depression); pages 66:18 to 68:13 (embarrassment, humiliation, anxiety with Ken Garff, New Century, Ameriquest, and the GMAC card); pages 185:22 to 193:16 (lost time from); pages 194:22 to 198:25 (stress reactions including stomach problems, allergies and anxiety); pages 203:19 to 205:19 (anxiety, embarrassment and humiliation). In my deposition of March 31, 2008, attached as Exhibit S , I discussed at length the prescription medication I took to treat these physical symptoms (pages 85:1 to 89:3; 90:2 to 91:25; 98:1 to 98:7), the allergy problems I suffered as a result of this stress (pages 89:4 to 90:1; 123:23 to 131:14) and the record of treatment for these symptoms (pages 156:10 to 173:7).

33.    This declaration is executed under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, and I declare that the foregoing is true and correct.

DATED this 7th day of January, 2009.

RAY BIRMINGHAM

14